# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of
A SAMSUNG GALAXY S10+, WITH UNKNOWN SN, IMEI 354640101529928, more fully described in Attachment A, attached hereto.

Case No. 23-sw-01488-JPO

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit located in the State and District of Colorado, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(u) | Knowing Theft of Firearms from Licensee |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Adam Omansky
*Applicant's signature*

SA Adam Omansky, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date: November 6, 2023

s/ James P. O'Hara
*Judge's signature*

City and state: Denver, CO

USMJ James P. O'Hara
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

This application seeks authorization to search a cellular telephone:

1) A Samsung Galaxy S10+, with unknown serial number, and IMEI 354640101529928.

The item to be searched is hereinafter referred to as "the Device." The Device was initially seized by law enforcement on October 26, 2023, in Aurora, Colorado. The Device is currently stored at the Denver ATF evidence locker, located at 950 17th St., Denver, CO 80202.






**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

For the Device listed and described in Attachment A, the following items, which constitute evidence of the commission of, the fruits of the crime, and/or instrumentalities of violations of: Title 18, United States Code, Section 922(u), Knowing Theft of Firearms from Licensee (the "Subject Offense"), specifically between the dates of October 25, 2023 through October 27, 2023.

1. The assigned telephone number associated with the cellular phone and any other identifying information about the device (ESN, MIN, IMSI, or IMEI);

2. The electronically stored phone book or contact list;

3. The call log, to include the record of incoming, outgoing, and missed calls;

4. Any and all information, ledgers, photographs, videos, spreadsheets, notes, software, documents, records, emails, text messages, programs, or other communications or correspondence, in any format and medium, pertaining to violations of the Subject Offense;

5. Any and all information related to the purchase, production, sale, or manufacture of controlled substances;

6. Bank and financial institution records and other records of financial transactions related to the commission of the Subject Offense and the collection and/or disposition of related proceeds;

7. Information tending to identify individuals engaging in the Subject Offense, and their co-conspirators, such as address books, contact lists, and communication records and identification documents, personal calendars, planners, itineraries, and travel records;

8. Location data tending to show participation in events relevant to the Subject Offense, such as GPS data and cell site data;

9. Records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses pertaining to the Subject Offense.

10. Records of or information about Internet Protocol addresses used by the Device;

11. Information about usernames or any online accounts or email addresses associated with the user of the Device;

12. Passwords, encryption keys, and other access devices that may be necessary to access the Device;

13. Evidence of who used, owned, or controlled the Device at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

14. Contextual information necessary to understand the evidence described in this attachment;

15. Social media applications present on the device, including Snapchat, Instagram and Facebook, as these applications may contain GPS and location information indicating where the phone has been used; photographs and/or videos showing the identity of the device owner/user, the identity of known and unknown coconspirators, discussions pertaining to narcotics or firearms, including the acquisition and distribution thereof.

16. Any and all financial records, including bank account or credit card account information, to include account applications, statements, receipts, checks, deposit slips, receipts, disbursement journals, record of cash transactions, money orders, cashier’s check, check stubs, check registers and checking and savings account documents.

17. Stored digital images, in any format (to include any associated metadata) which depict information pertinent to the Subject Offense such as: potential co-conspirators, firearms and their accessories, proceeds, trip information, narcotics, and narcotics-related paraphernalia.

DEFINITIONS:

As used above, the terms “records” and “information” include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any memorialized handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Adam Omansky, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKROUND**

1. Your Affiant, Adam Omansky, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, within the meaning of Title 18, United States Code, Section 3051, that is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2. Your Affiant has been an ATF Special Agent for over one year. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking, and conspiracy laws. Your Affiant has participated in numerous federal firearms and narcotics investigations as an ATF Special Agent in which narcotics and firearms used in violation of federal law have been recovered. Your Affiant also conducted and/or participated in such investigations as a sworn police officer in the State of Colorado. Prior to becoming an ATF Special Agent, Your Affiant was a Police Agent with the Lakewood Police Department (LPD) in Lakewood, Colorado for over 3 ½ years. As a Police Agent, Your Affiant was assigned to the patrol division. Your Affiant's duties involved responding to calls for service and proactive policing. Your Affiant has made over 140 felony and misdemeanor arrests during my tenure. Your Affiant investigated cases of serious violent crime to include but not limited to, Robbery, Aggravated Assault, Narcotics Crimes, Unlawful Possession of Dangerous Weapons, and Unlawful Discharge of Firearms. Your Affiant has also investigated cases of property crimes including but not limited to, Burglary of a Dwelling, Burglary of a Business, 1st Degree Aggravated Motor Vehicle Theft and Criminal Trespassing.

3. Your Affiant has received training and instruction related to investigating armed drug traffickers and conspiracy laws. You Affiant works with and benefits from the knowledge of other law enforcement officers with decades of experience enforcing federal firearms laws, investigating armed drug traffickers and conspiracy laws. Your Affiant investigates violations of federal firearms laws, federal narcotics laws and illegal firearms trafficking in the normal course of his duties and is familiar with the facts of this case.

4. Your Affiant makes this affidavit in support of an application for a search warrant to search a cellular phone ("the Device"). The Device is as follows: a Samsung Galaxy S10+, with unknown serial number, and IMEI 354640101529928. The Device, which is more fully described in Attachment A, was recovered from the possession of Jonatan LEIVA. Attachment B identifies with particularity the evidence your Affiant seeks permission to search for and seize.

5. The Device was initially seized by law enforcement officers on October 26, 2023, in Aurora, Colorado, from Jonatan LEIVA. In your Affiant's training and experience, the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of law enforcement.

6. The applied-for warrant would authorize the forensic examination of the Device identified in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B. Based on the information below, there is probable cause to believe the Device described in Attachment A contain evidence described in Attachment B. As set forth below, there is probable cause to believe that the Device contains evidence of Title 18, United States Code, Section 922(u), Knowing Theft of Firearms from Licensee.

7. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offense are located in the Device described in Attachment A.

## TECHNICAL TERMS

8. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering

information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications or "apps". Apps, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

b. Digital camera: Most cellular telephones and computers are equipped with a digital camera. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each

satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

9. Based on my training, experience, and research, and from consulting the manufacturers' advertisements and product technical specifications available online, I know that the Device has capabilities that allow it to serve as wireless telephones, digital cameras, portal media players, GPS navigation devices, and they can access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

10. Based on my training and experience, Your Affiant is aware of the following about cellular phones, hereinafter and below and in the Attachments "Device."

11. Based on my knowledge, training, and experience, Your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

12. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, digital storage devices can contain electronic evidence of how a digital storage device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Digital storage devices users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used the Device, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Digital storage devices'

file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a digital storage device is evidence may depend on other information stored on the digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. That firearms traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product. These traffickers often maintain these electronic images stored on digital devices such as cell phones. One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

g. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving unlawful possession and distribution of firearms, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic Device used to commit the Subject Offense of this type may contain: calls and voicemails between suspects and co-conspirators ; text messages between suspects and co-conspirators; GPS searches and information associated with traveling in order to scout locations for firearms transactions; GPS searches and information associated with traveling in order to distribute firearms; internet searches pertaining to targeted locations, relating to firearms; photographs and/or videos exchanged between an individual suspects and co-conspirators involved in, distributing firearms and individuals attempting to purchase firearms; social media apps such as Facebook or Instagram, where the phone owner may be communicating with others regarding firearms; email accounts with emails containing communications of firearms distribution and unlawful firearm possession. Additionally, devices are often used

to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone. In addition, people involved in the distribution of narcotics are likely to communicate using texts, email, or by phone to arrange to further their criminal activity.

h. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

15. *Need to review evidence over time and to maintain entirety of evidence*. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your Affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the device consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the device or information from a copy of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

### Investigation

17. Your Affiant became involved in an investigation into the activities of Brayan ENRIQUEZ and Jonatan LEIVA in October 2023. This investigation stemmed from ENRIQUEZ and LEIVA's involvement of a burglary of the Federal Firearm Licensee (FFL # 584031066B10762) named Denver Bullets, which is located at 1600 West 13th Avenue in Denver, Colorado. Your Affiant, the secondary investigator, reviewed the Denver Police Report 2023 – 577358, titled Burglary of a Business.

### Denver Police Report 2023-577358

18. On October 25, 2023, Denver Police Department (DPD) officers were dispatched to the business named Denver Bullets, located at 1600 West 13th Avenue, regarding a reported burglary. Officers arrived at the burglary site and contacted the reporting parties, MM and RS. RS reported that at the time of the burglary, the business was occupied by several employees; however, based on the location of the employees, the employees did not see the suspects enter the business and or remove the stolen firearms.

19. RS explained that the storefront of the business was left unattended for approximately 15 minutes. RS stated MM, a store employee, received a phone call at 3:39 p.m. from a witness, who expressed that he observed people tossing firearms into a bag, which raised his suspicion. RS relayed that MM informed him of this information, which caused him to begin to investigate the passerby claim. MM and RS went to the storefront and entered the business; this section of the business held firearms on display for sale. RS performed a quick inspection and noticed that several firearms had been taken without his permission or consent. MM reported that approximately 20 handguns and 8 rifles were missing at the initial report.

20. The officers contacted the witness, identified as JP, and conducted a field interview with JP, who stated the following: As he drove away from his nearby place of employment, he observed two kids at West 13th Avenue and North Quivas Street carelessly toss AR-15-style rifles into a rubber tote and into a car. JP relayed that this caused him suspicion, and he phoned the owner of the business. JP described the vehicle as a sedan, possibly a Toyota Corolla, black or gold in color, bearing a partial California plate of "7RSQ." JP described the suspects as two Hispanic males, approximately 18 years of age.

## YOUR AFFIANT'S INVOLVEMENT

21. On October 26, 2023, your Affiant was notified of the investigation. Your Affiant responded to the scene to conduct a subsequent investigation. Your Affiant arrived at 1600 West 13th Avenue and spoke with DPD Detective Michael Clark, the principal investigator. Detective Clark informed your Affiant of the investigation's details and the surveillance still images of the suspect.

### <u>Image Scanning Through the Division Of Motor Vehicles</u>

22. With the surveillance still images provided of the suspect, ATF Analyst Andy Morrow completed an image scanning request form generated by the Department of Revenue – Division of Motor Vehicle (DMV). ATF Analyst Morrow attached the below-listed images to the form and submitted a formal request for the DMV to conduct an image scan of the suspects against DMV records, specifically Colorado driver's licenses. Your Affiant included the images below as a reference to illustrate the images provided to ATF Analyst Morrow.



Suspect A Suspect B Suspect A Suspect A

23. TFO Sloan received notification that the DMV located a possible match of the suspects involved in the burglary. Furthermore, the notification indicated that the information provided is considered a crime-stopper tip and not probable cause for an arrest and that further investigative techniques will need to be applied. Your Affiant received the following information:

### <u>Suspect A</u>

24. The DMV indicated that Suspect A resembles an individual named Brayan ENRIQUEZ with a date of birth of October 08, 2003. As explained below, this was ultimately identified as suspect A in the photographs above.



Right Index

| Customer Identifier | | | Document Discriminator | |
|---|---|---|---|---|
| 170666906 | | | 6785364 | |
| SSN | | | DOB | |
| | | | 10/08/2003 | |
| NAME | | | | |
| ENRIQUEZ, BRAYAN | | | | |
| ADDRESS | | | | |
| 19545 E VASSAR DR | | | | |
| CITY | | State | Zip | |
| AURORA | | CO | 80013 | |
| Height | Weight | Hair | Eyes | Sex |
| 5'-07" | 150 lbs | BLK | BRO | M |
| Issued Date | | Expiration Date | | |
| 07/06/2021 | | 10/08/2024 | | |
| Card Type | | Production Status | | |
| Identification Card | | ProductionComplete | | |

**Suspect B**

25. The DMV indicated that Suspect B resembles an individual named Raymond Joseph Casias-Martinez. As explained further below, it was ultimately determined that Casias-Martinez was not involved in the crime.

26. Based on the information provided, investigators began researching the last known addresses of the alleged suspects. Your Affiant would like to inform the courts that the information provided by the DMV was only utilized as a tool to further the investigation.

27. Investigators learned that Brayan ENRIQUEZ's last known address was 2050 Nome Street, in Aurora, Colorado. Further, investigators learned Joseph Casias-Martinez's last known address was 9280 Fir Drive in Thornton, Colorado.

**2050 Nome Street**

28. Several investigators responded to 2050 Nome Street in Aurora, Colorado. Investigators immediately noticed that the residence was vacant; specifically, the residence had a for sale displayed. Investigators knocked on the door and learned that the house was vacant. Based on the discovery, Investigators left the residence and began searching for additional addresses.

**9280 Fir Drive**

29. ATF responded to 9280 Fir Drive in Thornton, Colorado. ATF established surveillance at this location. As agents approached the residence, TFO Gerald Sloan learned that Casias-Martinez was not involved in the FFL burglary.

30. Your Affiant learned that through several law enforcement databases, Brayan ENRIQUEZ had crossed the United States border with an individual named Jonatan LEIVA. Investigators immediately obtained LEIVA's Colorado driver's license dossier, which included his photograph.

31. TFO Sloan conducted a side-by-side comparison of LEIVA with the still images of the suspect.




32. Based on the comparison, your Affiant identified LEIVA as a potential suspect in the FFL burglary and eliminated CASIAS-MARTINEZ as the second suspect.

**<u>1214 Ironton Street</u>**

33. ATF agents and investigators responded to 1214 Ironton Street. ATF Group Supervisor Jason Cole knocked on the residence's front door and was greeted by Patricia Gonzalez-Carpio, Gregorio Leiva, and Mailbely Gonzalez-Leiva. Standing at the front door's threshold, Cole asked if LEIVA was home. They informed Cole that LEIVA was in his bedroom. Cole inquired if he could speak with LEIVA regarding the investigation. Mailbely Gonzalez-Leiva acquiesced to the request and went to get LEIVA. A few minutes later, LEIVA appeared, and Cole spoke with LEIVA as he stood at the front door. LEIVA, without being requested, sat on the step of the residence. Cole noted that he spoke with LEIVA in a conversational tone and did not display a weapon. Further, Cole relayed that LEIVA was not placed in handcuffs during the non-custodial interview. The following is not a transcript or exhaustive summary of the interview with LEIVA but rather is intended to provide limited excerpts of the substance of the interview that are pertinent.

34. Cole informed LEIVA that ATF was investigating firearms stolen yesterday, October 25, 2023. LEIVA said he was at work all day yesterday at his family-owned painting company. Cole had previous knowledge from criminal justice databases that LEIVA crossed the United States border with Brayan ENRIQUEZ. Cole showed LEIVA a Colorado DMV Photograph of ENRIQUEZ. LEIVA denied knowing ENRIQUEZ. GS Cole showed LEIVA still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023 (Fig. 1-2). LEIVA stated he was the person in the photograph (Fig. 2). LEIVA denied knowing if ENRIQUEZ was the other person who was with him.



Figure 1 Figure 2

35. LEIVA was placed into handcuffs and detained. Investigators spoke with Patricia and Gregorio and asked for consent to search their residence—1214 Ironton St. The parents verbally agreed to the search and signed ATF Form 3220.11 Consent to Search. Later, LEIVA was asked for consent to search his room inside the residence—1214 Ironton St. LEIVA verbally agreed to the search and signed ATF Form 3220.11 Consent to Search.

36. At this time, GS Cole informed LEIVA that he was under arrest. GS Cole ordered LEIVA to stand up and turn around. LEIVA complied. TFO Anderson approached and placed LEIVA into handcuffs. GS Cole conducted a pat down of LEIVA and retrieved a cell phone from LEIVA's front pants pocket. GS Cole secured the phone and placed it into "Airplane Mode". The phone was an Android cell phone; specifically a Samsung Galaxy S10+.

37. LEIVA asked Cole if he could speak with investigators somewhere else. LEIVA was led to an unmarked police car. LEIVA was uncuffed from one hand. LEIVA was formally advised by Cole with the utilization of ATF Form 3200.4 Advice of Rights and Waiver. LEIVA knowingly and voluntarily waived his Miranda rights and agreed to speak with agents. LEIVA signed ATF form 3200.4 Advice of Rights and Waiver.

38. LEIVA said that he was at work yesterday, October 25, 2023, and got off early. LEIVA estimated he got home at 1400 hours. When LEIVA got home, he took the dog for a walk around the neighborhood. As LEIVA was returning home, he saw ENRIQUEZ's car drive by. LEIVA said that it was a black or dark-colored vehicle and said it was possibly a Honda.

39. LEIVA knows ENRIQUEZ as "Tony," hereinafter referred to as ENRIQUEZ. ENRIQUEZ stopped and asked if LEIVA wanted to hang out. LEIVA got into ENRIQUEZ's car, and they went to get cigarettes. LEIVA said ENRIQUEZ got a call from an unknown person asking if ENRIQUEZ wanted to go shooting at a shooting range. ENRIQUEZ asked LEIVA if LEIVA wanted to go. LEIVA agreed to go. LEIVA said he does not own a gun, and he did not think that ENRIQUEZ owned a firearm. ENRIQUEZ told LEIVA that they needed to go get ammunition.

40. LEIVA said they only went to one store. When they got there, they entered the store, knocked, and rang the bell attached to the front door. LEIVA said they checked the door, and it was open, so they went in. LEIVA said that it was strange because no one was there. ENRIQUEZ said that they could take things, and LEIVA became uncomfortable. ENRIQUEZ told LEIVA to go to the car. LEIVA went to ENRIQUEZ's vehicle and waited. LEIVA thought that ENRIQUEZ told him to start the car. LEIVA said that ENRIQUEZ came out with a box and something else full of firearms. ENRIQUEZ put the firearms in the back seat of the car. LEIVA was in the passenger seat, and ENRIQUEZ got in the driver's seat. ENRIQUEZ then drove them away from the store. LEIVA asked ENRIQUEZ what they had just done. ENRIQUEZ apologized to LEIVA and said he was sorry for getting LEIVA involved. LEIVA asked to be taken home. ENRIQUEZ dropped LEIVA off several blocks away and made him walk home. LEIVA said that ENRIQUEZ took all the guns, and he did not take any.

**Consent to Search**

41. Investigators searched LEIVA's bedroom and found the matching jacket worn by one of the suspects.





**Identification of Suspects**

42. Investigators spoke to LEIVA's brother Joel Leiva. Joel stated that on October 25, 2023, he received a telephone call from LEIVA stating something was about to go down.

43. Special Agent Matt Pound showed LEIVA's parents the still photographs from the surveillance footage of the firearms theft from Denver Bullets on October 25, 2023 (Fig. 1-2). LEIVA's parents stated they recognized ENRIQUEZ. They stated that ENRIQUEZ is LEIVA's friend and always comes around.

44. Based on the discovery of the jacket, coupled with LEIVA's admissions and identification by parents, your Affiant affirmed that LEIVA and ENRIQUEZ were involved in the burglary of the gun store.

**SUSPECT VEHICLE AND FIREARMS MISSING TO DATE**

45. To date, law enforcement has not recovered the suspect getaway vehicle. Your Affiant spoke with ENRIQUEZ' sister Stephanie. Stephanie was not in custody or in handcuffs. Stephanie was shown still photographs of the vehicle from the surveillance footage of the firearms theft which occurred on October 25, 2023 (Fig. 3-4). Stephanie said that was their vehicle. She said she drives it sometimes, but said that ENRIQUEZ and LEIVA drive the vehicle primarily. Stephanie said she did not know where the vehicle was.



Fig. 3 Fig. 4



Fig. 5 Fig. 6 Fig. 7

46. Similarly, law enforcement has not recovered the stolen firearms to date. In part, your Affiant seeks to search LEIVA's phone to learn if the co-conspirators discussed their scheme to steal from the FFL, if they discussed any intended purpose for the firearms, or if the pair discussed a method of concealing the stolen goods.

**CONCLUSION AND REQUEST**

47. Based on the information contained in this affidavit, it is your Affiant's belief that there is probable cause to believe that contained within the Device, described in Attachment A, there exists evidence of the commission of, the fruits of crime, or instrumentalities of violations of the "Subject Offense" as described in Attachment B.

48. Therefore, your Affiant respectfully requests that this court issue a Search Warrant for the Device described more fully in Attachment A, to search for the items described in Attachment B.

I, Adam Omansky, being duly sworn, depose and states under penalty of perjury that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

*s/Adam J. Omansky*
Adam J. Omansky
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Submitted, attested to, and acknowledged by reliable electronic means on November 6, 2023.

s/ James P. O'Hara
THE HON. JAMES P. O'HARA
United States Magistrate Judge

**Reviewed and Submitted by R. Alex Cárdenas, Special Assistant U.S. Attorney.**